| | |
|---|---|
| **LESLIE LEETH DICKERSON FOGGER**<br>(Plaintiff)<br><br>**VERSUS**<br><br>**CENTURYTEL, INC.**<br>(Employer and Defendant)<br>**and**<br>**Group Long Term Disability Insurance Benefits for Employees of CENTURY TELEPHONE ENTERPRISES, INC.,**<br>(Employee Welfare Benefit Plan and Nominal Defendant)<br><br>**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**<br>(Insurer and Real Party in Interest) | 𝕌nited 𝕊tates 𝔻istrict ℂourt<br>for the<br>𝕎estern 𝔻istrict of 𝕃ouisiana<br><br>**Monroe Division**<br><br>**Civil Action No. 10-741**<br><br><br>**COMPLAINT**<br><br>**Alleging ERISA Violation**<br><br>**[Jury Trial Demanded as to Defendant, HARTFORD]** |

## INTRODUCTION

1.      This is an action by a participant in an employee welfare benefit plan against the Plan, the

Plan sponsor, and the insurance company that acted as a *de facto* plan fiduciary, for injunctive relief

and damages to enforce her rights under the Plan to collect long-term disability income benefits.

Defendants terminated the payment of long term disability benefits to Plaintiff LESLIE FOGGER,

in direct contravention of the terms of the PLAN and the HARTFORD policy, claiming that she was

no longer disabled from her job, despite the lack of any evidence of any improvement in her

condition from the time she was deemed disabled and began receiving long-term disability benefits,

*C:\CLIENTS\Fogger v. The Hartford\PLED 090115 Original Federal Court Complaint.wpd*

and despite any real evidence that she was not "disabled" as defined in the PLAN and the policy.

## PARTIES

2.    Plaintiff, LESLIE LEETH DICKERSON FOGGER (hereinafter "FOGGER"), is an adult individual who is a citizen of the State of Louisiana, residing in the Parish of Bossier.

3.    Defendant, CENTURYTEL, INC. (Formerly Century Telephone Enterprises, Inc. Name changed: 5/7/1999), is a corporation organized pursuant to the laws of the State of Louisiana, and herein domiciled, with its principle place of business located in Monroe, Louisiana.

4.    Defendant HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY (hereinafter "Hartford") is an insurance company with its principal place of business in Connecticut but with offices in various other states throughout the United States.  It is authorized to do, does business, and can be found within the Western District of Louisiana; it has appointed the Louisiana Secretary of State as its agent for service in Louisiana.

5.    The nominal defendant, GROUP LONG TERM DISABILITY INSURANCE BENEFITS FOR EMPLOYEES OF CENTURY TELEPHONE ENTERPRISES, INC. ("The Plan"), is an Employee Welfare Benefit Plan as defined in the Employee Retirement Income Security Act ("ERISA"), 29 USC, § 1100, *et. seq.,* and is sponsored by the Defendant, CENTURYTEL, INC., but Plaintiff is informed and believes and therefore alleges that the PLAN does not exist as a separate entity.

## JURISDICTION

6.    Jurisdiction is conferred on this Court by Sections 502(e) and (t), 502(a)(1)(A) and (B), and 502(a)(2) and (3) of ERISA, 29 U.S.C. §§1l32(e) and (t), 1132(a)(I)(A) and (B), and 1132(a)(2) and (3), and by 29 U.S.C. §1331(a) and 28 U.S.C. §2201.

## VENUE

7.      The principal place of business of Defendant, CenturyTel, Inc., is within this district, and within the Monroe Division.  The Plan is grants full discretion to the administrator of The Plan, which is identified as Defendant, CenturyTel, Inc.  Thus, the plan administrator is doing business within this district and this division.  Additionally, the real defendant, HARTFORD, may be found within this district.

## THE PLAN

8.      The employee's welfare benefit plan (hereinafter "THE PLAN") sponsored by CENTURYTEL, INC. is a qualified plan pursuant to 29 U.S.C. § 1001, et seq.

9.      The PLAN is a fully insured "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(1), and may be sued under ERISA as an entity pursuant to 29 U.S.C. § 1132(d)(1).

10.      The PLAN designated Employer (CENTURYTEL, INC.) as the plan administrator.

11.      The PLAN  gave the plan administrator full discretion to interpret its terms and to determine eligibility for benefits.

12.      Plaintiff is informed and believes and therefore alleges that the PLAN purchased insurance policy #G-164,156 (hereinafter the "Policy"), underwritten and issued by HARTFORD, effective January 1, 1999, to provide some or all of the benefits which may become due to eligible employees covered by the PLAN.

13.      HARTFORD policy #G-164,156 is a policy of disability income insurance that obligates HARTFORD to pay benefits to covered employees who are totally disabled.

14.      The policy provides for both short term disability income benefits and long term disability income benefits.

15.     As an employee of CENTURYTEL, INC., FOGGER was entitled to participate in the plan.

16.     The policy defines total disability as follows:

> **Total Disability or Totally Disabled** means that:
>> (1) during the Elimination Period; and
>> (2) for the next 24 months, you are prevented by:
>> (a) accidental bodily injury;
>> (b) sickness;
>> (c) mental illness;
>> (d) substance abuse; or
>> (e) pregnancy,
>
> from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilijative Employment approved by us.
>
> After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.

17.     The policy further defines "any occupation" as:

> **Any Occupation**, if used in this Booklet-certificate, means occupation:
>> (1) for which you are qualified by education, training or experience; and,
>> (2) that has an earnings potential greater than an amount equal to the product of your Indexed Pre-disability Earnings and the Benefit Percentage.

18.     There is no PLAN document naming HARTFORD as a fiduciary of the PLAN within the meaning of ERISA, 29 U.S.C. § 1002(21)(A).

19.     Employees of HARTFORD exercised authority and control over the payment of LTD, benefits, which are PLAN assets.

20.     Pursuant to 29 C.F.R. § 2560.503-1, HARTFORD employees have acted as the claims administrator of the Policy pursuant to which FOGGER is entitled to disability benefits under

the PLAN.

21.     As the claims administrator, HARTFORD stood in a *de facto* fiduciary relationship to PLAN beneficiaries, including Plaintiff FOGGER.

## FOGGER'S CAREER

22.      For approximately seventeen years before January, 2001, FOGGER was an employee of CenturyTel, Inc. (hereinafter "Employer" or "CenturyTel"), rising to the position of vice president.

23.     FOGGER, without even a college degree, enjoyed a successful career at CenturyTel, working in various capacities in sales and administration.

24.     FOGGER was the 9th corporate employee hired in the new Wireless Division of CenturyTel when she was hired as the manager of carrier relations in February, 1987.

25.     FOGGER began her working career working in a warehouse at Manville Forest Products (Now Graphics Packaging) in 1970.  In 1976 she was promoted to management when she accepted the position of Shipping and Warehouse Supervisor - Grocery Bags & Sacks Division.  She worked in that position until 1978, when she was again promoted; this time to Quality Control Supervisor – Grocery Bags & Sacks Division.  In 1980, she rose to Production Supervisor, a job she held until 1983.

26.     In 1983, FOGGER accepted the position of planning and scheduling manager at Sturn Machine Company, a manufacturer of parts for large boats and water craft, that employed 60 employees in the plant and four in the office.  She worked in that position until beginning her career at CenturyTel in 1987.

27.     After working as the manager of carrier relations for three years, FOGGER was promoted to Director, Wireless Administration, in August, 1990, and reported to the corporate Vice

President-Finance, Wireless.

28.     In August, 1992, FOGGER was again promoted; this time to Vice President, Wireless, CenturyTel, Inc. – Region I.  In this position, she had overall accountability and responsibility for all wireless sales (15 retail stores, 20 kiosks in Walmart stores, 15 direct sales force employees, 50 indirect sales agents), field customer service, technical, financial, human resources, public relations, customer relations, and administrative functions in Region I, which covers the states of Louisiana, Arkansas, and Texas and is supported by approximately 250 personnel.  In addition, there are 130 personnel in a call center that directly reported to FOGGER until 1997.  After 1997, these personnel indirectly report to her after a company re-organization.  Frequent travel by car and air was required of FOGGER for extended periods of time.  Flexible work hours were required and FOGGER often worked in excess of 60 hours per week.  While in this position, FOGGER reported to the corporate President of the Wireless Group and had 11 direct reports – Region Sales Manager, Region Customer Service Manager, Region Technical Manager, Region Finance Manager, Region Human Resources Manager, Administrative Assistant, and 5 Division Managers in the field.

29.     In April, 1999, FOGGER was promoted to Southern Region Vice President, where she had overall accountability and responsibility for technical, financial, human resources, technical sales support, public relations, customer relations, and administrative functions in the Southern Region for telephone, wireless, internet, long distance, and security.  The Southern Region covers all CenturyTel markets in the states of Louisiana, Arkansas, Texas, Mississippi, and Tennessee and is supported by approximately 800 employees.  While in this position FOGGER was frequently required to travel by car and air for extended periods of time.  She reported to the corporate Vice President of Operations and had approximately 13 direct reports – 2 Field Vice Presidents, Region

Operations Manager, Region Engineering Manager, Region Finance Manager, Region Human Resources Manager, Region Public Relations Manager, Administrative Assistant, 5 General Managers in the field.

30.     In June, 2000, after FOGGER's symptoms that eventually led to her disability, had worsened, she assumed the position of Vice President, CLEC Sales, where she had overall accountability and responsibility for establishing a direct sales force for CenturyTel's new CLEC line of business in markets designated by corporate.  Initial markets for implementation were in Louisiana (Shreveport & Monroe), Michigan (Grand Rapids & Lansing), and Wisconsin (Lacrosse).  FOGGER was accountable and responsible for the assignment, achievement, tracking, and reporting of sales quotas to meet the expectations of the corporation and its shareholders.

31.     In December, 2000, shortly before FOGGER's condition became totally disabling, she was given a new title: Director, CLEC Indirect Sales.  Although she was given this title to free up the vice-president's job that she would be vacating, she never actually performed any work in this capacity.  FOGGER's last day on CenturyTel's payroll was January 18, 2001.

## FOGGER'S DISABILITY

32.     Her physicians diagnosed FOGGER with papillary thyroid cancer with nodal involvement when she was twelve years old in 1961. She underwent surgery then, and several times in the ensuing years.  Even though she had a continuing battle with this cancer, FOGGER overcame the limitations imposed by this disease and continued to work and to advance in the corporate environment.

33.     In 1999, FOGGER had additional surgery that caused her to have an accessory nerve palsy.  Also in 1999, FOGGER was diagnosed with Meniere's disease and underwent another surgery to install a shunt which caused left ear sensorineural hearing loss.  The Meniere's disease causes attacks

of vertigo and dizziness that are severe, incapacitating, and unpredictable.

34.     FOGGER also has been diagnosed as having degenerative disc disease, with some evidence

of nerve root involvement.

35.     FOGGER had a cervical lymph node dissection in 1999 that caused severe and extensive

scarring with spinal accessory nerve injury confirmed by electrodiagnostic studies demonstrating

denervation and only partial function.

36.     FOGGER also suffers with hypothroidism, hyperlipidemia, gasrtoesophageal reflux disease,

insomnia, degenerative joint disease of her left shoulder with adhesive capsulitis, right knee

degenerative joint disease, and cervical and lumbar degenerative disc disease with disc protrusion

into the sacral canal.

37.     FOGGER's treatment includes steroid injections for pain control, physical therapy, surgery,

and numerous medications.

38.     FOGGER's medications include the following

| | |
|---|---|
| Levothyroxine 175 Mcg | (Prescribed for thyroid deficiency; known side effects include headache, sleep problems (insomnia), nervous or irritable feeling, fever, hot flashes, sweating, appetite changes, weight changes.) |
| Klor-Con M10 | (Prescribed for potassium deficiency; known side effects include    nausea, vomiting, flatulence, abdominal pain/discomfort and diarrhea.) |
| Oxycodone-APAP 10-325 Mg | (Prescribed to reduce pain; known side effects include constipation; dizziness; drowsiness; headache; nausea; sleeplessness; vomiting; weakness.) |
| Oxycontin 20 Mg Tablet | (Prescribed to reduce pain; known side effects include shallow breathing, slow heartbeat, seizure (convulsions), cold, clammy skin, confusion, severe weakness, feeling light-headed, fainting,   nausea, |

|  | vomiting, constipation, loss of appetite, dizziness, headache, tired feeling, dry mouth, sweating and itching.) |
|---|---|
| Tizanidine HCL 4 Mg | (Prescribed as an anti-spasmodic; known side effects include dry mouth, somnolence/sedation, asthenia (weakness fatigue and/or tiredness), dizziness, abnormal liver tests, constipation, dyskinesia, nervousness and pharyngitis.) |
| Neurontin 300 Mg | Prescribed for chronic nerve pain; known side effects include increased seizures, fever, chills, body aches, flu-like symptoms, swelling of ankles or feet, confusion, rapid back and forth movement of eyes, tremor,  memory problems, trouble concentrating, dizziness, drowsiness, weakness, tired feeling, lack of coordination, blurred vision, nausea, vomiting, stomach pain, loss of appetite, diarrhea, constipation, dry mouth, runny or stuffy nose, sore throat, headache, sleep problems (insomnia), unusual dreams, and acne, mild skin rash.) |
| Effexor XR 75 Mg | (Prescribed for anxiety and depression; known side effects include increased blood pressure, severe headache, blurred vision, easy bruising or bleeding, severe blistering, peeling, red skin rash, very stiff (rigid) muscles, high fever, sweating, fast or uneven heartbeats, tremors, overactive reflexes, nausea, vomiting, diarrhea, loss of appetite, feeling unsteady, loss of coordination, trouble concentrating, memory problems, weakness, confusion, hallucinations, fainting, seizure, shallow breathing or breathing that stops, drowsiness, dizziness, feeling nervous, dry mouth, mild nausea, constipation, decreased libido, blurred vision, increased appetite, and changes in weight. |
| Benicar HCT 40-12.5 Mg | (Prescribed  for hypertension; known side effects include feeling of impending syncope, chest pain, feeling short of breath, even with mild exertion, fever, swelling, rapid weight gain, urinating more or less than usual, or not at all, jaundice (yellowing of the skin or eyes), dry mouth, increased thirst, drowsiness, |

|  | restless feeling, confusion, fast heart rate, feeling light-headed, fainting, seizure (convulsions), stomach pain, heartburn, diarrhea, joint pain, dizziness, spinning sensation, headache, and dry cough.) |
|---|---|
| Triglide 160 Mg | (Prescribed for hyperlipidemia; known side effects include severe stomach pain, nausea, vomiting, unusual weakness, fever, joint pain, indigestion, bloating or gas, and rash.) |
| Lunesta 3 Mg | (Prescribed for insomnia; known side effects include aggression, agitation, changes in behavior, thoughts of hurting oneself, hallucinations, day-time drowsiness, dizziness, "hangover" feeling, problems with memory or concentration, anxiety, depression, nervous feeling, headache, nausea, stomach pain, loss of appetite, constipation, dry mouth, and mild skin rash.) |
| Estradiol/Norethindrone Acetate | (Prescribed for hormone replacement; known side effects include nausea, loss of appetite, headache, bloating, mental/mood changes (e.g., depression, memory loss), one-sided weakness, vision problems, slurred speech, leg pain, swelling, chest pain, trouble breathing, stomach pain, joint pain.) |
| Prevacid 30 Mg Tablet | (Prescribed for acid reflux; known side effects include headache, nausea, stomach pain, and diarrhea or constipation.) |

## THE CLAIM

39.     On June 12, 2001, FOGGER, then age 53, submitted an application for disability income

insurance coverage to HARTFORD.

40.     Because of the particular provisions of the PLAN, FOGGER should then have been entitled

to disability benefits if she was unable to perform the essential duties of her own occupation

41.     As is the usual case, that application was met with a request for more information.  The

additional information was promptly supplied,

42.     More information was requested and that was promptly supplied.

43.     On information and belief, some of the medical information provided to HARTFORD was then given to its Associate Medical Director, George Kazda, M.D., who wrote a report on letterhead of Medical Advisory Group, LLC (but signed as the "Associate Medical Director for The Hartford"), dated September 22, 2001.

44.     Dr.Kazda's report stated his opinion that FOGGER "retains the functional capacity for return to work and requires no specific restrictions or physical limitations."  If this "Associate Medical Director for The Hartford" practices in any specialty it is not indicated in the report.

45.     The medical report from its "Associate Medical Director" was not provided to FOGGER.

46.     On October 2, 2001, HARTFORD wrote to FOGGER and told her that her claim was being denied because the information in the file did "not support an inability to perform essential duties of your occupation."  *Significantly, HARTFORD did not inform FOGGER of what additional information would be required to support her claim.*

47.     The denial letter listed the report by the "Associate Medical Director for The Hartford" (therein identified as a "Medical Advisory Group medical report dated 9/22/01") as one of the documents on which HARTFORD relied in reaching its decision to deny benefits, but the report was not otherwise identified, nor was FOGGER given an opportunity to comment on its contents.  She was invited to submit any "additional information not previously submitted" and particularly, "updated or additional medical information not currently on file" without addressing the issue of what specific information was needed or to support a finding that she was disabled and entitled to benefits.

48.     FOGGER appealed the decision and on December 20, 2001, was notified that HARTFORD

had changed its mind and found that she was disabled and entitled to benefits.

49.     After approving benefits, HARTFORD immediately informed FOGGER that she was required to apply for Social Security Disability Insurance Benefits, and that if she failed or refused to do so timely, HARTFORD would deduct an estimated amount of SSDI benefits from her HARTFORD benefits.

50.     FOGGER applied to the Social Security Administration and was found by that agency to be totally and permanently disabled.

51.     HARTFORD then began reducing its disability insurance benefits payments to FOGGER by the exact amount of her SSDIB payments.

52.     When FOGGER received a check from the Social Security Administration for past-due benefits in excess of $43,000, HARTFORD demanded that she repay that amount to HARTFORD.

53.     FOGGER immediately complied with HARTFORD's demand and paid the full amount of her past-due SSDI benefits to HARTFORD.

54.     FOGGER's condition continued to deteriorate.  On December 10, 2002, she had a Polysomnography that was interpreted by Dr. Paul Shuler as abnormal, with marked increase in stage 1 sleep and no delta or REM Sleep.  Her sleep was severely fragmented by brief EEG arousals.  He opined that FOGGER's poor sleep efficiency was probably related to chronic pain.

55.     On April 29, 2003, FOGGER underwent a functional capacity evaluation (FCE), that indicated that she would have difficulty performing even sedentary work involving use of her right upper extremity.

56.     On July 7, 2003, HARTFORD wrote FOGGER and informed her that on July 18, 2003, she would need to meet a new definition of disability - the "any occupation" definition, but that it had

conducted a review of her file including current medical information, and that it had determined that she did meet that definition and that she would continue to qualify for benefits "on and after 07/18/03."

57.     Periodically through the years between July, 2003 and May, 2007, FOGGER was requested to and did supply additional and current medical information.

58.     Meanwhile, FOGGER's condition continued to deteriorate.

59.     On April 19, 2004 FOGGER underwent a nerve root block procedure that involved using a fluoroscope to guide a needle into the cervical spine to inject it with anesthetic and a steroid.  This was done in an attempt to alleviate the pain in her cervical spine.

60.     On October 19, 2004, FOGGER was seen by Dr. Russell Tynes, her primary care physician, who noted Weight Gain, Headache, Dizziness and Vertigo, Lymphadenopathy, Lumps, Neck Pain and Neck Stiffness, Back pain, Decreased Range of Motion and Muscle Atrophy in Neck, Right knee pain, Chronic pain, Headaches, Incontinence Stool, Incontinence Urine, Memory loss and. Seizures, Mild anxiety, Mood changes and Fatigue and ease of bruising.

61.     On January 24, 2005, FOGGER was seen by Dr. Tynes who noted Weight Gain, Headache, Dizziness and Vertigo, Lymphadenopathy, Lumps, Neck Pain and Neck Stiffness, Back pain, Decreased Range of Motion, Neck pain, Right knee pain, Muscle Atrophy (NECK) and Muscle pain (NECK), Chronic pain, Headaches, Incontinence Stool, Incontinence Urine, Mild anxiety, Mood changes and Fatigue, and Easy Bruising.   Dr. Tynes also recored that his patient "HAS ATTEMPTED TO WORK AT INTERVALS, OFFICE/COMPUTER WORK; HAS HAD A FLARE UP OF THE SAME SYMPTOMS AS BEFORE WITH PAIN, SPASM, INSOMNIA (DUE TO THE PAIN), AGITATION, AND NOW BLOOD PRESSURE IS UP."  He ordered a bone scan.

62.     On March 17, 2005, Dr. Tynes again saw FOGGER and recorded that she reported a cough, congestion in her head and chest, a headache, and that she had had a low grade fever during the past week.  He noted that her neck was mildly tender and that there was a decreased range of motion; that she had Lymphadenopathy.  He also noted that she was taking Oxycodone - Acetaminophen, that she had headache, dizziness and vertigo, neck pain and neck stiffness, back pain, decreased range of motion, neck pain, right knee pain, muscle atrophy (neck) and muscle pain (neck), mild anxiety, mood changes and fatigue, and easy bruising.

63.     On April 28, 2005, FOGGER again saw Dr. Tynes, and reported that she had not felt good for the past two weeks, that she had increased pain.  Her bone scan was negative.  The remainder of his comments documented continuation of the symptoms previously noted, with the addition of right knee pain, insomnia, and edema.

64.     On April 29, 2005, FOGGER saw Dr. William Whyte, her treating pain management physician.  He noted weakness and atrophy in the musculature of the right upper extremity, He noted that she was a chronic pain patient and discussed with her the possibility that the chronic pain would persist.  He ordered a functional capacity evaluation (FCE).  He prescribed Percocet 5/325, TID and Neurontin 300, Q8.  He planned to see her again in three months.

65.     In response to a request for additional information, FOGGER forwarded medical records to HARTFORD on May 7, 2005.  These records included reports of the above mentioned visits with Dr. Tynes and Dr. Whyte, the MRI report and the Polysomnography Interpretation, as well as an attending physician's statement by filled out and signed by Dr. Tynes on a form provided by HARTFORD.

66.     On July 11, 2005, Dr. Whyte noted left lumbar radicular pain and an annular tear at the disc

between the fourth and fifth lumbar vertebrae.  He prescribed Percocet 10/325 and Mobic 7.5.

67.    A week later, on July 18, 2005, Dr. Whyte performed an epidural steroid injection into FOGGER's lumbar spine.

68.    On July 26, 2005, FOOGER underwent another lumbar epidural steroid injection.

69.    Following the epidural steroid injections, FOGGER underwent a series of Quas Polar Interferential IF 250 Muscle Stimulation treatments.  These were performed by Dr. Whyte on August 2, 4, 16, and 25, and September 1, 2005.

70.    On November 15, 2005, Dr, Tynes noted that FOGGER was no longer trying to work as it aggravated her pain and spasms.  He also recorded hypertension, shoulder pain, esophageal reflux, neck pain and stiffness, insomnia, anxiety, headaches, fatigue, vertigo and dizziness.

71.    FOGGER saw Dr. Whyte again on December 12, 2005.  He diagnosed lumbar radicular pain and right spinal accessory neuropathy.  He again prescribed Neurontin and Percocet.

72.    FOGGER continued to see both Dr. Whyte and Dr. Tynes and her complaints remained consistent: lumbar and neck pain, vertigo and dizziness, headaches, and anxiety.

73.    On June 25, 2005, FOGGER saw Dr. Timothy Talbert, an orthopaedic surgeon.  He noted that she had constant shoulder pain and a reduced range of motion in the left shoulder.  His diagnosis was rotator cuff tear, tenosynovitis, and shoulder pain.  He ordered outpatient physical therapy,

74.    On February 20, 2007, Dr. Talbert performed surgery on FOGGER's left shoulder to relieve adhesive capsulitis and impingement syndrome.

75.    On May 30, 2007, Scott Martin, a HARTFORD employee (position not given) called FOGGER and made an appointment to see her at her home on June 21, 2007.

76.    When Mr. Martin arrived at FOGGER's home, he showed her some video surveillance that

was allegedly done on March 14, 2007 and May 14 and 15, 2007.

77.     The videos document many hours and even whole days of no activity; and also show FOGGER sitting in a chair in a school auditorium with her grandson standing near her.  They were apparently watching the kindergarten graduation of another grandson; FOGGER lifted her four-year-old grandson from the floor to a chair, but did not otherwise lift or carry him.

78.     FOGGER was asked to and did sign a statement outlining the activities shown on the video and stating that the "surveillance video accurately depicts my current level of functionality and shows my current level of restrictions and limitations..  It is important to note that *the statement makes no mention of carrying a child*.

79.     Plaintiff is informed and believes and therefore alleges that these videos were sent to her treating physicians for comment.  FOGGER is informed and believes and therefore alleges that none of her treating physicians actually viewed the videos or commented on them.

80.     The videos and selected medical evidence was then apparently sent to Dr. Robert Pick, along with a report from the investigator who did the surveillance.

81.     On October 11, 2007, HARTFORD wrote FOGGER and told her that she no longer met the definition of disability.   This letter, signed by Todd Rupert, "Investigative Specialist" advised FOGGER that the decision was based in part on the opinion of Dr. Pick, who ". . . reported that based on a review of the records, as well as the surveillance videos, the symptomatology is focused on your left shoulder symptoms and complaints."

82.     FOGGER notified HARTFORD that she had retained an attorney to represent her in this matter (not the undersigned counsel).

83.     FOGGER is informed and believes and therefore alleges that a HARTFORD representative

telephoned to the attorney named by FOGGER, but was unable to confirm that the attorney represented FOGGER.

84.     FOGGER became aware at some point, that the attorney she thought was representing her had taken no actions on her behalf.

85.     FOGGER appealed HARTFORD's decision to terminate her benefits by letter to HARTFORD dated April 7, 2008; this appeal was sent directly by FOGGER to HARTFORD and did not contain any reference to the attorney FOGGER thought was then representing her.

86.     On May 23, 2008, HARTFORD wrote to the attorney that had been identified by FOGGER as her representative and told him that the review of her case was completed and that "the weight of the in the claim file viewed as a whole supports that you are able to perform full time sedentary work with the following restrictions: no climbing, no heavy machinery operation, occasional navigation of stairs, 5 pound occasional lifting limit with right upper extremity, no overhead activity, and that you should have the ability to change position frequently throughout the workday."

87.     The letter informed FOGGER that her administrative appeals were exhausted and the record was closed; that FOGGER's only remaining remedy was to file suit in federal court.

88.     The letter also informed FOGGER that the medical information had been reviewed by "Dr. Brock" and "Dr Farber" of Reliable Review Services, without further identification of these two physicians.

89.     According to the plain wording of the May 23, 2008 letter, HARTFORD relied on the opinions of Drs. Farber and Brock, but it did not give FOGGER an opportunity to comment on those opinions or provide any rebuttal to them, thus denying FOGGER a full and fair review as required by 29 U.S.C. § 1133(2).

90.     FOGGER retained undersigned counsel and authorized him to communicate with HARTFORD.

91.     Counsel wrote to HARTFORD on June 24, 2008, asking that the record be kept open for the inclusion of information necessary for a decision in the case.

92.     HARTFORD responded on June 25, 2008, by a letter addressed to counsel over the signature of Corey Welch, Appeal Specialist.  That letter stated that ". . . we will not consider new information or further reconsider our determination."  It further advised that "It is our position that Mrs. Fogger was informed of and given ample opportunity to supplement the claim with new information for the appeal review."  This last statement conveniently overlooks the facts then known to HARTFORD, that it had no letter of representation from the attorney identified by FOGGER as her representative, that it had not been able to verify by telephone that this attorney represented her, and that the appeal came from FOGGER herself, and not the attorney.

93.     After reviewing the record and perceiving its shortcomings, Counsel again wrote to HARTFORD on July 28, 2008.

94.     The letter of July 28, 2008 included a copy of the record that Counsel had "Bates" stamped, and asked for confirmation that this was the entire record.

95.     That letter also enclosed the following documents that Counsel contended should have been in the administrative record but were not:

| DESCRIPTION | BATES NUMBERS |
|---|---|
| a. The Summary Plan Description | 00935 - 00953 |
| b. Social Security Decision | 00954 - 00964 |
| c. Dr. Talbert Medical Records | 01013 - 01014<br>01022 - 01030 |

|  |  |
|---|---|
|  | 01090 - 01095 |
| d.  Dr. Whyte Dictation Addendum | 01000 - 01000 |
| e.  Dr. Tynes Medical Records | 01001 - 01012<br>01015 - 01021 |
| f.  Dr. Whyte Medical Records | 01031 - 01043<br>01120 - 01120 |
| g.  Polysomnography Interpretation<br>(By Dr. Paul Schuler - 12/10/02) | 01163 - 01163 |

96.    Counsel also enclosed the following documents for inclusion in the record:

|  |  |
|---|---|
| a.  Well Necessities Split Night Sleep<br>Disorder Testing Report (5/27/08) | 01049 - 01050<br>01058 - 01084 |
| b.  Dr. Whyte - Procedure Note (5/28/08) | 01119 - 01119 |
| c.  Dr. Tynes - Rx for CPAP (6/7/08) | 01051 - 01051 |
| d.  Dr. Tynes Chart (6/3/08 - 6/10/08)<br>with medication record | 01052 - 01054<br>01056 - 01057 |
| e.  "Final" Decision on Appeal | 01121 - 01123 |

97.    Finally, Counsel reminded HARTFORD that its fiduciary duty to FOGGER required that it

consider all evidence that is submitted to it that it has a "fair opportunity to consider."

98.    Counsel included copies of the following cases to underscore how seriously the 5th Circuit

Court of Appeals takes the duty of the administrator to consider all evidence presented to it before

suit is filed:

|  |  |
|---|---|
| a.  *Vega v. National Life Ins. Serv, Inc.*,<br>188 F.3d 287 (5th Cir. 1999) | 01124 - 01140 |
| b.  *Estate of Bratton v. Nat'l Union Fire<br>Ins. Co.*, 215 F.3d 516 (5th Cir. 2000) | 01141 - 01150 |

    c. *Abate v. The Hartford*, 471 F. Supp.        01151 -01162
      2d 724 (E.D. Tex. 2006)

99.    HARTFORD returned the box containing the letter of July 28, 2008 and the enclosures to

Counsel unopened.

100.    The medical information that was included in Counsel's letter of July 28, 2008, but returned

by HARTFORD unopened, make it clear that FOGGER's condition had not improved, but, in fact,

had continued to deteriorate.

101.    If HARTFORD had fairly considered the medical evidence about the co-morbid conditions

suffered by FOGGER, it could not have reasonably concluded that FOGGER was no longer disabled.

## FIRST CAUSE OF ACTION
[Claim for Restoration of Past Due Disability Benefits, Interest, and Attorney's fees and
for Recognition of Right to Future Disability Benefits]

102.    FOGGER incorporates those allegations contained in paragraph 1 through 101 as though set

forth at length herein.

103.    An actual controversy exists between FOGGER and Defendants arising out of the events

alleged herein above. Specifically, Defendants have no legal basis for terminating FOGGER's

benefits.

104.    Under the terms of the PLAN, Defendants agreed to provide FOGGER with certain disability

insurance benefits in accordance with the terms and conditions set forth.

105.    To date, Defendants have failed and refused to pay FOGGER the benefits to which she is

rightfully entitled from October 11, 2007 to the present.

106.    FOGGER has satisfied all conditions precedent under the PLAN and is thus eligible to

receive benefits for she has not waived or otherwise relinquished her entitlement to benefits.

107.    Denial of benefits to FOGGER was contrary to and in breach of the terms of the PLAN and in contravention of the duties imposed upon it by ERISA.

108.    FOGGER seeks reimbursement and compensation for any and all benefits she would have received from the date of termination, continuing into the future as long as she continues to fulfill the requirements under the PLAN.

109.    As a direct and proximate result of the aforementioned conduct of the Defendants in failing to pay FOGGER benefits, she has been damaged in an amount equal to the amount of benefits to which she is entitled under the terms of the PLAN plus interest, for a total amount to be determined at the time of trial.

110.    Defendants unreasonably and wrongfully denied FOGGER benefits based on unfair claims procedures to support their conclusions that she was not in fact totally disabled, in violation of ERISA

111.    The denial of the benefits is a breach of the PLAN and Policy, in utter disregard of the Record and Claim File and unsupported by substantial evidence.

112.    To the extent that HARTFORD can be considered an administrator of the PLAN (FOGGER contends that HARTFORD acted as *de facto* administrator), HARTFORD is conflicted as it both administers the PLAN and pays benefits.

113.    The unlawful behavior of Defendants is evidenced by the following:

    a) Failing to authorize benefit payments to FOGGER at a time when they knew that she was entitled to said benefits under the terms of the Plan, in bad faith and contrary to the PLAN;

    b) Unreasonably withholding payments from FOGGER knowing her claims for benefits were valid;

    c) Unreasonably failing to pay benefits without having any evidence, substantial or

otherwise, supporting their decision to deny benefits;

d) Completely disregarding FOGGER's treating physicians' assessment of her medical condition and how it restricts and limits her from performing her occupation without any basis for doing so;

e) Selectively emphasizing certain evidence in order to cast a favorable light on its position while ignoring the objective test results and conclusions of FOGGER's treating physicians regarding the conditions for which they rendered treatment;

f) Improperly retaining medical file reviewers who are biased in favor of HARTFORD, to obtain opinions that support its denial of benefits;

g) Completely disregarding FOGGER's own assessment of her medical condition and how it restricts and limits her from performing her occupation;

h) Completely disregarding FOGGER's complaints of pain, contrary to HARTFORD's own claims procedures;

i) Engaging in a pattern of procedural irregularities to advance their own personal interests in denying benefits, to the detriment of PLAN participants;

j) Consistently acting in their own personal interests instead of those of the PLAN and its participants;

k) On information and belief, improperly "sanitizing" the record by removing medical evidence supporting FOGGER's claim prior to providing a copy of the claim file to FOGGER's counsel during the appeal process;

i) On information and belief, improperly "sanitizing" the record by removing medical evidence supporting FOGGER's claim prior to providing a copy of the claim file to a vocational expert for vocational analysis;

m) On information and belief, in failing to provide the IME physicians with all FOGGER's relevant medical records;

n) Notifying FOGGER of the existence of an opinion of a medical file reviewer at the same time that it notified her that her appeal was denied and that the record was closed, thus denying her the right to comment on the evidence, in violation and contravention of her statutorily guaranteed right to a full and fair hearing;

o) Failing and refusing to consider the findings of the Social Security Administration, though it instructed FOGGER to apply for Social Security Disability Insurance Benefits, and

received 100% of the benefit of the finding of disabled by that agency;

p) Failing and refusing to consider evidence of FOGGER's co-morbid conditions, including Meniere's disease with associated attacks of vertigo and dizziness that are severe, incapacitating, and unpredictable, papillary thyroid cancer with nodal involvement severe and extensive scarring with spinal accessory nerve injury, hypothroidism, hyperlipidemia, gasrtoesophageal reflux disease, insomnia, degenerative joint disease of her left shoulder with adhesive capsulitis, right knee degenerative joint disease, and cervical and lumbar degenerative disc disease with disc protrusion into the sacral canal, and some evidence of nerve root involvement;

q) Relying on the reports of their biased medical records reviewers, who did not review all relevant medical evidence supporting FOGGER's disability and did not examine FOGGER themselves, as a basis for denying her claim;

r) Relying on the surveillance video, which did not establish FOGGER's ability to work an eight-hour day, five days a week, as a basis for denying her claim;

s) Failing to conduct an appropriate vocational assessment of FOGGER prior to denying her benefits; and

t) Improperly denying FOGGER benefits without any information that her condition had improved from the time HARTFORD initially approved her claim.

114.   Contrary to clear, compelling and substantial medical evidence, HARTFORD wrongfully terminated FOGGER's total disability benefits, denied FOGGER's appeal, and has wrongfully maintained that denial to this date.

115.   Contrary to clear and compelling Fifth Circuit jurisprudence (of which HARTFORD was informed), HARTFORD failed and refused to consider information provided to it after its denial of FOGGER's appeal.

116.   As a direct and proximate result of the conduct alleged herein, FOGGER has been damaged in an amount equal to the amount of benefits she would have received had Defendants paid her benefits.

117.   FOGGER has been forced to bring the instant action as a direct result of Defendants'

unlawful denial and violations of the PLAN and ERISA.

118.    As a direct result of Defendants' acts, actions and activities, FOGGER has incurred costs aud attorney fees in the prosecution of this action.

119.    FOGGER is entitled to recover her attorney fees aud costs incurred in prosecution of the instaut action, including prejudgment interest, pursuaut to 29 U.S.C. § 1 132(g), ERISA § 502(g).

120.    FOGGER is also entitled to an order of this Honorable Court directed to the PLAN and to HARTFORD, commanding them to continue the payment of disability benefits to FOGGER for so long as her disability continues.

121.    FOGGER is also entitled to engage in discovery to determine the extent of the conflict of interest and its effect on the adverse decisions in this case.

### SECOND CAUSE OF ACTION
[Breach of Fiduciary Duty]

122.    FOGGER incorporates by reference and realleges the allegations contained in Paragraphs 1 through 119, above.

123.    The PLAN  was required pursuant to Part 4 of Title I of ERISA to discharge its duties with respect to benefit claims prudently, for the exclusive benefit of Plan participants and beneficiaries, and in accordance with the specific fiduciary obligations imposed therein and under the Plan documents.

124.    Although the plan documents do not contain any delegation of the PLAN's fiduciary duties to HARTFORD, HARTFORD acted as a *de facto* fiduciary, and therefore is liable for any breach of the PLAN's fiduciary duty to FOGGER.

125.    In its decisions to terminate FOGGER's benefits, HARTFORD acted arbitrarily and

capriciously, in willful disregard of its obligations pursuant to ERISA, the terms of the Plan, and the medical evidence submitted. HARTFORD acted only in its own financial interest in denying FOGGER's claim. Accordingly, HARTFORD has breached its fiduciary obligations under ERISA and the Plan.

126.    Plaintiff is informed and believes, and therefore alleges, that HARTFORD has engaged in a pattern and practice of systematic efforts to delay and deny claims for disability benefits by unfair and arbitrary review tactics and procedures for its own financial gain. HARTFORD must therefore be enjoined from continuing said unlawful and arbitrary practices.

### THIRD CAUSE OF ACTION
[Right to Trial by Jury Against HARTFORD]

127.    FOGGER incorporates by reference and realleges the allegations contained in Paragraphs 1 through 124, above.

128.     Defendant CENTURYTEL, INC. was granted absolute discretion to determine eligibility for benefits by the plan documents.

129.    The plan documents do not contain a delegation of that discretion to Defendant HARTFORD.

130.    HARTFORD is not a Fiduciary of the PLAN, and enjoys none of the protections of ERISA.

131.    HARTFORD terminated payment of disability benefits to FOGGER is contravention of its contractual obligations and pertinent provision of the Louisiana Insurance Code, including the duty of good faith and fair dealing.

132.    FOGGER is entitled to an award of all withheld disability benefits, to penalty of twice the amount of the withheld benefits and to an award of a reasonable attorney' fee.

133.    FOGGER is entitled to an award of penalties and attorney's fees against HARTFORD,

pursuant to state law.

134. FOGGER is entitled to a trial by Jury of all her demands against HARTFORD.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1. For an Order directing Defendants to reinstate FOGGER under the PLAN and Policy;

2. For an Order requiring Defendants to award to FOGGER total disability benefits due and owing her from October 11,2007 to the present, including all cost of living adjustments;

3. For an Order requiring Defendauts to award FOGGER all past benefits due to her under the PLAN aud POLICY, together with an award of pre-judgment interest;

4. For an Order declaring that FOGGER is to continue to receive disability benefits in the future for as long as she continues to qualify for benefits under the PLAN and policy.

5. For an award of reasonable attorneys' fees pursuaut to 29 U.S.C. § 1 132(g), costs incurred in this action; aud for such other and further relief as the Court deems appropriate;

6. For an Order requiring Defendants to continue to provide to FOGGER all other ancillary benefits to which she is entitled under the terms of the PLAN aud/or to instruct their agents, contractors or other entities, to establish all other ancillary benefits due to FOGGER under the PLAN, and

7. For an Order allowing discovery and ordering the parties to confer to draft a discovery plan.

FOGGER further prays:

    a. that this Honorable Court find that HARTFORD is not a plan fiduciary and enjoys none of the protections provided by ERISA.

    b. for trial by jury of all her demands against HARTFORD.

    c. for judgment in her favor and against HARTFORD for a penalty of twice the amount of

benefits wrongfully withheld, together with legal interest, attorneys' fees and for all costs of this proceeding.

FOGGER further prays alternatively, and only in the alternative that this Honorable Court should find that the evidence presented is insufficient to determine whether Defendants breached their fiduciary and contractual duties to FOGGER, then FOGGER prays for remand to the Administrator for the inclusion and consideration of additional evidence of FOGGER's continued disability.

**DESIGNATION OF TRIAL COUNSEL**

Pursuant to LR 11.2, William T. Allison, LSBA Bar Roll No 2420, is designated as trial counsel.

*William T. Allison*

WILLIAM T. ALLISON
LSBA Roll No. 2420
3421 Youree Drive
Shreveport, LA 71105
Telephone: (318) 869-0304
Facsimile: (318) 869-4911
E-Mail: bill@allisonlaw.com

ATTORNEY FOR PLAINTIFF
LESLIE LEETH DICKERSON FOGGER
